concurring in part and concurring in the judgment.
I am in full agreement with the majority’s result, and with much of its reasoning. I write separately, however, to explain the few areas of disagreement that prevent me from joining the court’s opinion in full.
My first point of departure relates to the majority’s explanation of the combined-taxable income method for allocating income between a parent company and its subsidiary foreign sales corporation (FSC). Under that method, the portion of the export income attributed to the FSC is based on a “transfer price” for the exported goods that would allow the FSC to derive net income equal to “23 percent of the combined taxable income” of the FSC and the parent attributable to the transaction. 26 U.S.C. § 925(a)(2) (1994). The transfer price is a hypothetical price at which the export goods are assumed to be sold by the parent to the FSC; once determined, it is used to calculate the taxable income of the FSC and the parent. See id. Because the transfer price is assumed to be paid by the FSC to the parent, it is *485 treated as a component of income for the parent and an expense item for the FSC.
As the majority observes, the general objective of the combined-taxable-income method is to treat the FSC and the parent as a partnership, and then apportion 23% of the net income attributable to the export transaction to the FSC and 77% to the parent. But I cannot agree that “the use of accrual-based accounting, in which income is recorded in the first year and costs in the next, would not change this outcome.” Majority Op. at 474. In reaching that conclusion, the majority does not calculate the applicable transfer price under the statutory formula, but instead assumes that the income or loss of the FSC-parent partnership will always be apportioned on a 23% to 77% basis. Because the parties’ principal dispute in this case deals with how to calculate the applicable transfer price, I think that assumption is unwarranted.
As noted above, the combined-taxable-income method treats the parent-to-FSC sale of the export goods as occurring at a hypothesized transfer price that would allow the FSC to derive net income equal to “23 percent of the combined taxable income” of the FSC and the parent attributable to the transaction. 26 U.S.C. § 925(a)(2). “Combined taxable income” for a given export sale is defined as “the excess of the foreign trading gross receipts of the FSC from the sale over the total costs of the FSC” and the parent, including the parent’s “cost of goods sold and its and the FSC’s noninventoriable costs ... which relate to the foreign trading gross receipts.” 26 C.F.R. § 1.925(a)-lT(c)(6)(i).
When a transaction is fully accounted for during one taxable year, this calculation is straightforward. Subtracting the parent’s costs and the FSC’s costs from the FSC’s sales yields combined taxable income. The transfer price is then set at a level that, when subtracted along with the FSC’s other costs from the FSC’s sales, yields a profit for the FSC that is 23% of combined taxable income.
But this case is more complicated, because P & G used an advance-payment transaction to create a mismatch between the income and expenses attributable to the export sales. Applying the rules that ordinarily govern accrual-method taxpayers, P & G-FSC recorded receipts from the transaction in 2000 when it received payment from P & G-Canada, but P & G did not record an expense for cost of goods sold until 2001, when it provided the exports goods to P & G-FSC. See 26 C.F.R. § 1.451-l(a) (under the accrual method, a payment is generally recorded as income for tax purposes in the taxable year in which it is received); 26 U.S.C. § 461(h)(2)(B) (a deduction based on the taxpayer providing property is not taken into account until the taxpayer provides such property).
The parties have advanced two competing understandings of how to calculate combined taxable income — and thus the applicable transfer price — under these circumstances. P & G contends that it was entitled to use generally applicable annual-accounting principles to calculate the combined taxable income attributable to the advance-payment transaction. Because P & G-FSC recognized income from the transaction in 2000 and incurred only minor expenses in that year, while P & G did not recognize its cost-of-goods-sold deduction until the export goods were delivered in 2001, P & G argues that almost all of the $374 million payment from P & G-Canada to P & G-FSC constituted combined taxable income in 2000. The government responds that P & G was required to include all costs attributable to the advance-payment transaction in its calculation of combined taxable income, regardless of the taxable year in which the *486 costs were incurred. In support of this argument, the government emphasizes that combined taxable income is calculated on a transaction-by-transaction basis. It also suggests that the regulation’s reference to “total costs,” 26 C.F.R. § 1.925(a)-lT(c)(6)(i), sweeps broadly to include all costs, no matter when incurred.
In my view, P & G is correct that, under the regulation governing the computation of combined taxable income, it was not required to include all costs attributable to the advance-payment transaction, regardless of the year in which they were incurred. The relevant regulation, 26 C.F.R. § 1.925(a)-lT, starts by defining combined taxable income from a transaction as “the excess of the foreign trading gross receipts of the FSC from the sale over the total costs of the FSC” and the parent. Id. § 1.925(a) — lT(c)(6)(i). But it goes on to say that, subject to certain limitations, “the methods of accounting used by the FSC and [parent] to compute their taxable incomes will be accepted for purposes of determining the amounts of items of income and expense ... and the taxable year for which those items are taken into account.” Id. § 1.925(a)-lT(c)(6)(iii)(A) (emphasis added). In the ordinary case, therefore, the same method of accounting that is used by the taxpayer to determine when an item of income or expense is included in taxable income should also be used to determine when the item is properly includable in combined taxable income under the FSC provisions. Contrary to the district court’s conclusion, there is no general requirement that a taxpayer include in combined taxable income all expenses related to an export transaction, even if they are properly accounted for in a later year under the taxpayer’s usual method of accounting.
I concede that, unlike the majority, I cannot readily distinguish the Tax Court’s decision in General Dynamics Corp. v. Comm’r, 108 T.C. 107 (T.C.1997). It is true that General Dynamics involved the completed-contract method of accounting, rather than the ordinary accrual-accounting principles involved here. But the court’s conclusion was that the “total costs” used to calculate combined taxable income include all costs relating to an export transaction, even if, under the taxpayer’s method of accounting, they had been properly deducted in a prior year. See id. at 124-25. Under the Tax Court’s logic, it seems to me that “total costs” would fairly include costs incurred and deducted in a later tax year, such as P & G’s eost-of-goods-sold deduction in this case. For the reasons set out above, however, I think that conclusion is incorrect. Thus, rather than attempt to distinguish General Dynamics, I would simply decline to follow it.
That is not to say that P & G was entitled to account for the advance-payment transaction in the way it did. An FSC and its parent may “generally” use any method of accounting that qualifies as valid under the tax laws. 26 C.F.R. § 1.925(a)-lT(c)(6)(iii)(B). But a method of accounting that is otherwise valid may nonetheless be disallowed by the IRS if it results in a “material distortion” of the income of the FSC or the parent. Id. I think P & G’s accounting method rather spectacularly flunked that test here.
It did so by flouting a fundamental distinction in this statute — namely, that between combined taxable income and gross receipts. As a result of the mismatch between receipts and expenses created by P & G’s accounting methodology, P & G’s calculation of combined taxable income did not include the cost of goods sold in the advance-payment transaction — which is to say, almost all of the costs associated with the transaction. Thus, as the majority observes, P & G’s accounting method de facto treated the gross receipts from the *487 advance-payment transaction as though they were the income attributable to the transaction. See Majority Op. at 20-21. And by doing so, P & G apportioned 23% of those gross receipts (less P & G-FSC’s own trivial costs) to P & GFSC as tax-advantaged income, even though it could have apportioned only 1.83% of those same gross receipts to P & G-FSC if it had actually elected to use the gross-receipts method. See 26 U.S.C. § 925(a)(1); 26 C.F.R. § 1.925(a)-lT(c)(2).
The result was to increase P & G’s tax benefit more than tenfold beyond what the statute plainly contemplates. “Material distortion” might well be a vague term; but if it encompasses anything, it surely encompasses a scheme that stultifies the fundamental distinctions set forth in the statute itself. That, I think, is precisely what we have here.
* * *
Although we follow different paths along the way, my thinking in this case ultimately converges with the majority’s. Like the majority, I conclude that P & G was not entitled to account for the advance-payment transaction in the way that it did. I also agree with the majority that the IRS’s regulations permitted P & G to recalculate its tax liability using the gross-receipts approach, and I do not believe the variance doctrine applies to foreclose that relief here.
I therefore join parts III.C and III.D of the majority opinion, and I concur fully in the result.